# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES A. THOMPSON, JR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 97-1015 (RJL) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**FILED**

**SEP 3 0 2018**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(September 30, 2018) [Dkt. # 195]

From 1985 through 1997, James A. Thompson, Jr. ("Thompson" or "plaintiff") was employed by the District of Columbia ("District") Lottery and Charitable Games Control Board ("Lottery Board"). In August 1996, Thompson was transferred from his job as Security Systems Administrator to a Security Officer position slated for elimination through a reduction in force ("RIF"). Thompson was eventually discharged, at which point he sued the District, the Lottery Board, and several individual Lottery Board employees alleging, as relevant here, that he was terminated without due process in violation of the Fifth Amendment and 42 U.S.C. § 1983. After multiple trips to our Circuit Court,[1] all that remains of this case is plaintiff's due process claim against the District under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 691 (1978). The District has moved for summary judgment on plaintiff's municipal liability claim. Upon consideration of the parties' briefing and the

---

[1] *See Thompson v. District of Columbia* ("*Thompson I*"), 428 F.3d 283 (D.C. Cir. 2005); *Thompson v. District of Columbia* ("*Thompson II*"), 530 F.3d 914 (D.C. Cir. 2008); *Thompson v. District of Columbia* ("*Thompson III*"), 832 F.3d 399 (D.C. Cir. 2016).

entire record herein, the District's motion for summary judgment is GRANTED for the reasons set forth below.

## BACKGROUND

Plaintiff held various positions with the Lottery Board over the course of his twelve years of employment from 1985 to 1997. *See* Stmt. of Undisputed Material Facts ("SUMF") ¶ 1 [Dkt. # 197]. In August 1996, Lottery Board Executive Director Frederick King reassigned Thompson from the position of Security Systems Administrator to the position of Security Officer. *Id.* at ¶¶ 2–3; *Thompson II*, 530 F.3d at 916. The following day, King told him that the latter position had been identified for elimination as part of a RIF, effective at the end of September. Am. Compl. ¶ 61 [Dkt. # 8]; *Thompson II*, 530 F.3d at 916. Thompson did not receive notice or an opportunity to challenge his position transfer. He did, however, receive 30 days' notice and an opportunity to challenge his inclusion in (and separation pursuant to) the RIF, a separate "employment action" that Thompson did, in fact, contest. *Thompson III*, 832 F.3d at 342; *see* SUMF ¶ 7–8; Aff. of James Thompson ¶ 11 [Dkt. # 122-8]; Letter from King to Plaintiff re: RIF (Aug. 27, 1996) [Dkt. # 122-14]; District Mem. of Law 3–4 [Dkt. # 137] (summarizing Thompson's use of administrative grievance process); Pl.'s Resp. to Def.'s First Requests for Admission 15 [Dkt. # 137-1]; Pl.'s Grievance to District Office of Employee Appeals ("OEA") [Dkt. # 137-2]; Dep. of Carol Jackson Jones 4 [Dkt. # 153-6].[2] After the RIF, Thompson was

---

[2] Plaintiff challenged his separation before the District's Office of Employee Appeals but abandoned the challenge prior to a decision on the merits. SUMF ¶ 8; District Mem. of Law 4–5; District OEA Initial Decision 1 [Dkt. # 195-6].

placed on leave then reassigned to a temporary position, where he worked until the temporary position expired in January 1997. Am. Compl. ¶¶ 62–63, 70; *Thompson II*, 530 F.3d at 916.

In May 1997, Thompson filed this § 1983 action claiming, in relevant part, that his employment with the Lottery Board was terminated in violation of the Due Process Clause of the Fifth Amendment. The crux of Thompson's suit was that King and the District retaliated against him based on his efforts to uncover and report misconduct by Lottery Board subcontractors. *See* Am. Compl. ¶¶ 12–60; *Thompson III*, 832 F.3d at 341–42. In June 2004, another judge of this Court dismissed Thompson's complaint for failure to state a claim. *Thompson v. District of Columbia*, No. 97-1015, 2004 WL 5348862 (D.D.C. June 23, 2004) (TPJ). Our Circuit Court reversed and remanded, holding that Thompson's due process claim was actionable. *Thompson I*, 428 F.3d at 284, 288.

On remand, the case was reassigned to me and I eventually dismissed Thompson's due process claim on the ground that he lacked a protected property interest in his position. *Thompson v. District of Columbia*, 478 F.Supp.2d 5, 9–10 (D.D.C. 2007). The Circuit Court disagreed, holding that because Thompson was a career employee, he had a protected property interest in his position under District law and could not be terminated without due process. *Thompson II*, 530 F.3d at 918–20. Specifically, the *Thompson II* court held that Thompson's reassignment in August 1996 from Security Systems Administrator to Security Officer constituted a "constructive removal," which triggered his due process rights and entitled him to process at the time of the transfer—not, as occurred, at the time of the RIF. *Id.* at 919 n.4; *id.* at 919 (asking whether "the deprivation of [Thompson's]

3

property interests occur[ed] when he [was] transferred or when the RIF actually eliminate[d] the position" and holding that the deprivation occurred "at the time of the . . . pretextual transfer").

Discovery commenced following remand in August 2008, after which the parties submitted extensive summary judgment and other briefing. *See* [Dkt. ## 122, 125–26, 133–34, 136–40, 142, 150–53, 162, 164]. I denied both parties' dispositive motions and directed them to brief the issue of what damages, if any, Thompson could be awarded by a jury if his due process claim was tried. *See* [Dkt. ## 168–69]. I held argument on the issue in June 2014, and on December 10, 2014, I dismissed the case on the ground that Thompson could not recover damages because he offered no evidence that he would *not* have been terminated had he been afforded adequate due process. *See Thompson v. District of Columbia*, No. 97-1015, 2015 WL 13673454 (D.D.C. Feb. 18, 2015).

On appeal, our Circuit Court reversed the dismissal and held that Thompson's procedural due process rights were violated when he was reassigned to a position slated for elimination without prior notice and a hearing to challenge his transfer. *Thompson III*, 832 F.3d at 345 ("[Thompson] thus had a right to notice of that transfer and a hearing to challenge his transfer before it was made."). The Circuit Court remanded the case in August 2016 for me to determine whether the District can be held liable under § 1983 and *Monell* for Thompson's due process violation; and if so, the amount of damages to which he is entitled. *Id.* at 344. On February 27, 2018, the District moved for summary judgment on Thompson's *Monell* claim and filed its statement of undisputed material facts. *See* [Dkt. # 195]. Thompson opposed the District's motion and submitted a response to the District's

proposed undisputed facts. *See* [Dkt. ## 196–97]. The District filed its reply on March 6, 2018. *See* [Dkt. # 198].

## LEGAL STANDARD

### I.  Summary Judgment

Summary judgment is warranted when the pleadings, discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if it "may affect the outcome of the litigation." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017).

As the moving party, the District shoulders the initial burden to identify evidence demonstrating the absence of a genuine dispute of material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The District may do so by "citing to particular parts of materials in the record," or by showing that plaintiff, as the non-moving party, "cannot produce admissible evidence to support" the "presence of a genuine dispute." Fed. R. Civ. P. 56(c). In other words, the District "need only identify the ways in which [plaintiff] has failed to come forward with sufficient evidence to support a reasonable jury to find in [his] favor on one or more essential elements of the claim." *Grimes v. District of Columbia*, 794 F.3d 83, 93 (D.C. Cir. 2015). If the District meets its initial burden, then Thompson must "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S.

at 324 (internal quotation marks omitted). It is not enough for plaintiff to identify "a scintilla of evidence" or the "mere allegations or denials" of his pleadings in support of his assertions. *Anderson*, 477 U.S. at 248, 252. Without more, the District may prevail based on plaintiff's "failure of proof." *Celotex*, 477 U.S. at 323. In assessing the District's motion, I must "view the facts and draw reasonable inferences in the light most favorable to" Thompson as "the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations and internal quotation marks omitted).

## ANALYSIS[3]

### I. Municipal Liability Under 42 U.S.C. § 1983

To be liable under § 1983,[4] a municipality must be *actually* responsible" for the challenged conduct, meaning the relevant acts were "officially sanctioned or ordered" by the local government. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (emphasis

---

[3] The parties agree that the Lottery Board, as a subordinate agency of the District, is not a proper party to this lawsuit because it is *non sui juris* and therefore should be dismissed as a defendant. Def.'s Mot. for Summ. J. or, Alternatively, Mot. for J. on the Pleadings ("District Br.") 16 [Dkt. # 195]; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Br.") 1 n.1 [Dkt. # 196]; *see, e.g., Arnold v. Moore*, 980 F.Supp. 28, 33 (D.D.C. 1997) ("Governmental agencies of the District of Columbia are not suable entities.").

[4] Section 1983 of the Civil Rights Act provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

added) (internal quotation marks omitted); *see also Lozman v. City of Riviera Beach, Fla.*, — U.S. —, 138 S.Ct. 1945, 1951 (2018) (plaintiff's harm must have resulted from "the implementation of 'official municipal policy'" (quoting *Monell*, 436 U.S. at 691)). Thus, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 691); *see also Monell*, 436 U.S. at 694 (municipality is liable "when execution of [its] policy or custom . . . inflicts the injury"). Conversely, and inexorably, plaintiffs may not pursue municipal liability on a *respondeat superior* theory—that is, municipalities are not vicariously liable for the misconduct of their employees. *Monell*, 436 U.S. at 691; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) ("[W]hile Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*." (emphases in original)).

Our Circuit Court has explained that "[t]here are a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983":

> [1] the explicit setting of a policy by the government that violates the Constitution; [2] the action of a policy maker within the government; [3] the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become "custom"; or [4] the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.

*Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citations omitted). Here, Thompson's due process claim against the District is not based on an enrolled

municipal policy, nor does he allege that the District was indifferent to the risk that his due process rights would be infringed. Rather, Thompson's conception of District liability is that Lottery Director King either was authorized by the District to make final municipal policy such that the District may be held responsible for the violation of his due process rights, or that King acted pursuant to a widespread and longstanding District custom or practice of due process denial. *See* Pl.'s Br. 4.

As the District's summary judgment motion and statement of undisputed material facts contend that Thompson has failed to come forward with facts sufficient to find that the District "had the requisite policy or custom" for § 1983 liability, "[t]he burden thus shift[s] to [plaintiff] to produce admissible evidence establishing a genuine issue of material fact." *Bush v. District of Columbia*, 595 F.3d 384, 386 (D.C. Cir. 2010) (citing *Celotex*, 477 U.S. at 324). Viewing the record in Thompson's favor as I must, I conclude that he has not met his burden to identify such admissible evidence as to either of these theories of municipal liability against the District. How so?

### A. Final Policymaking Authority

Thompson contends that King's personnel decisions constituted municipal "policy" for which the District is liable. It has long been true that under certain circumstances even a "single act" may amount to municipal policy. *See, e.g., Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). But such circumstances are limited, lest the law of municipal liability devolve into *respondeat superior*. "[O]nly those municipal officials who have '*final* policymaking authority' may by their actions subject the government to § 1983 liability." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (emphasis added)

8

(quoting *Pembaur*, 475 U.S. at 483); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue").

Moreover, the municipal official must have final authority to set policy in the "*particular area*, or on [the] *particular issue*" involved in the challenged action. *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785 (1997) (emphases added); *see also Praprotnik*, 485 U.S. at 123 (official must be "responsible under state law for making policy in *that area* of the [municipality's] business" (emphasis in original)); *Pembaur*, 475 U.S. at 481 (official must "possess[] final authority to establish municipal policy with respect to the action ordered"). Whether an official exercises "final policymaking authority" in the relevant area is a legal question that must be decided by reference to "state and local positive law, as well as 'custom or usage' having the force of law." *Jett*, 491 U.S. at 737 (quoting *Praprotnik*, 485 U.S. at 124 n.1); *see also McMillian*, 520 U.S. at 786 (proper "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law"). "Where a plaintiff relies . . . on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes*, 208 F.3d at 57–58.

In this case, analytical prudence dictates that before assessing whether King had final authority to set District policy, I define the "particular area" of District policymaking that is relevant to my inquiry. In *Jett*, for example, the plaintiff sued a school district

contending that he was denied due process when he was reassigned from a football coaching position at one school to a non-coaching position at a different school. 491 U.S. at 706–07. In assessing whether the school district's superintendent was a final policymaker, the *Jett* Court focused on whether the superintendent "possessed final policymaking authority in the area of employee transfers." *Id.* at 738; *see also Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004) (defining relevant policymaking area as "employment-related disciplinary decisions for District employees"); *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1331 (11th Cir. 2003) (defining relevant policymaking area as "the entry and validation of warrants" and "the training and supervision of . . . employees in that regard").

According to Thompson, I should focus on whether King had final policymaking authority in conducting a RIF, which Thompson argues was "the action that caused [his] injury." *See* Pl.'s Br. 2, 7, 10. On two separate occasions, however, the Circuit Court has held that Thompson's procedural due process rights were triggered not by the RIF but by his reassignment *prior* to the RIF. *See Thompson II*, 530 F.3d at 919 (posing the question whether "the deprivation of [Thompson's] property interests occur[ed] when he [was] transferred or when the RIF actually eliminate[d] the position" and holding that the deprivation occurred "at the time of the transfer"); *Thompson III*, 832 F.3d at 344 (plaintiff "was deprived of a protected property interest in his Security Systems Administrator position when he was transferred to the Security Officer position"); *id.* at 345 ("The bottom line of our holding in *Thompson II* was that Thompson, as a career civil servant, was stripped of his property interest when he was placed in a position that had previously been

marked for elimination."). Thus, even if I was inclined to accept Thompson's invitation to focus on the RIF, our Circuit's reasoning compels me to decline it.

Guided by our Circuit's prior holdings, I must consider whether King exercised policymaking authority when he reassigned Thompson from Security Systems Administrator to the doomed Security Officer position, *not* when King took the separate and distinct employment action of including the latter position (and Thompson) in the RIF—a decision regarding which Thompson did receive notice and an opportunity to challenge. *See* SUMF ¶ 7. The relevant area of policymaking, then, is not implementing a RIF, but making personnel decisions, in particular employee transfers resulting in constructive discharge. With that in mind, Thompson's reliance on King's statutory powers under the so-called "RIF Acts" is misplaced. *See* Pl.'s Br. 7–8 (citing and summarizing the District's 1995 Budget Support Temporary Act and 1996 Modified Reduction-in-Force Temporary Amendment Act). That legislation temporarily provided District agency heads, King among them, with full discretion to "identify positions for abolishment" without limitation by "any other provision of law, regulation, or collective bargaining agreement," and it mandated that any District employee occupying an identified position be separated "[n]otwithstanding any rights or procedures established by any other" personnel statute. D.C. Code § 1-625.5(a), (c) (1996 Supp.); *see generally Washington Teachers Union Local No. 6 v. Bd. of Educ. of District of Columbia*, 109 F.3d 774, 777 (D.C. Cir. 1997); *Stevens v. District of Columbia Dep't of Health*, 150 A.3d 307, 314 (D.C. 2016).

The RIF legislation did not, however, vest in King any similarly unencumbered power to constructively remove District personnel by transferring them from a secure position to a position identified for abolishment. That is, while King's decision to include the Security Officer position in the RIF was unconstrained temporarily under District law, King's decision to reassign Thompson from Security Systems Administrator to Security Officer remained subject to constraints and requirements imposed by other personnel laws. Specifically, District law in effect at the time mandated that King exercise his authority to "[e]mploy other assistants and employees in accordance with the District of Columbia Government Comprehensive Merit Personnel Act of 1978 ['CMPA']"—i.e., the same law under which plaintiff claims he was denied due process. D.C. Code § 2-2503 (1981); *see also* D.C. Code § 3-1303(d)(3) (2001) (same)). The CMPA required each District agency to "provide for ten (10) days advance notice in writing prior to the taking of any action which adversely affects an employee," unless the employee's conduct presents an immediate threat. D.C. Code § 1-606.4(b) (1981); *see also Grant v. District of Columbia*, 545 A.2d 1263, 1263 (D.C. 1988) ("each agency of the District government . . . must give an employee ten days advance written notice of a proposed adverse action"); *id.* at 1263–64 (describing regulations promulgated under CMPA to govern adverse action process). The law further afforded District employees "the right to prepare a written response" to any notice of proposed adverse action, at least one independent internal review of the proposed action and the employee's response, and, in some cases, an adversarial hearing. *Id.* § 1-606.4(c), (d). In all cases, the District employee could be represented by counsel and had the right to appeal the action. *Id.* § 1-606.4(e), (f).

Given that Thompson's reassignment amounted to a constructive removal—clearly an action that adversely affected him—the CMPA should have afforded him the foregoing statutory protections. I do not agree that the RIF legislation, which by its terms exempted certain enumerated personnel actions from the CMPA's process requirements—the selection of positions for abolishment and the separation of employees occupying such positions—also exempted the antecedent, distinct personnel action of transferring an employee to a doomed position. *Cf. Thompson III*, 530 F.3d at 450 ("the District seems to have expressly exempted King from the ordinary requirements of the CMPA in making these decisions"). To be sure, the result for Thompson was the same—termination—but the reassignment and the RIF were distinct as a legal matter, and nothing in the RIF legislation leads me to conclude that the CMPA ceased to protect Thompson at the time he was transferred and constructively discharged. It follows then that King's challenged action—reassigning and thus constructively removing Thompson—was "constrained by policies not of [King's] making," thereby precluding King from exercising final policymaking authority in the area of personnel decisions like the one at issue here. *See Singletary v. District of Columbia*, 766 F.3d 66, 73 (D.C. Cir. 2014) (parole revocation board not a final policymaker for District in area of parole revocation where board was "constrained by policies not of [its] making" (quoting *Praprotnik*, 485 U.S. at 127)).[5]

---

[5] I note that the RIF legislation itself included limited procedures for notice and challenge that would have constrained King if the RIF legislation applied to Thompson's reassignment. *See* D.C. Code § 1-625.5(f) (1996 Supp.) ("Each employee selected for separation pursuant to this section shall be given written notice of at least 30 days before the effective date of his or her separation."); *id.* § 1.625.5(g) (permitting employees to

King's apparent departure from the CMPA's procedural protections does not alter this conclusion. "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127; *see Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (factors relevant to final policymaker analysis include "whether the official is constrained by policies of other officials or legislative bodies"). King did not enact the CMPA, King was not authorized by District law to ignore its requirements, and, as such, King's failure to afford Thompson the process he was due under the CMPA prior to transferring him cannot be attributed to the District. *See Singletary*, 766 F.3d at 713 (parole revocation board's "decision to depart from [District] policies by revoking Singletary's parole based on unreliable hearsay was not an act of the municipality for purposes of § 1983" (internal quotation marks and alterations omitted)); *Perez v. Metro. Transp. Auth.*, 883 F.Supp.2d 431, 437 (S.D.N.Y. 2012) (where allegations were not that officials acted pursuant to "policy formulation or rulemaking authority" but instead that officials "had the authority to make decisions pursuant to the rules in place," "[s]uch allegations are insufficient to establish . . . liability under *Monell*"). Indeed, the absence of any evidence that the Lottery Board directed or otherwise approved King's actions "suggests that the policymakers intended that [King

---

contest a RIF separation when, *inter alia*, the 30-day notice requirement was not followed); *see generally Washington Teachers Union Local No. 6*, 109 F.3d at 782.

would] abide by the municipality's stated policy," as set forth in the CMPA. *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997).[6]

Plaintiff makes much of King's general discretionary authority over Lottery personnel matters. *See* Pl.'s Br. 13. There is no question that King as Lottery Director exercised decisionmaking authority over a variety of employment issues within the agency. *See id.*; *Thompson III*, 832 F.3d at 349 (King "drew up the list of positions to be terminated, moved employees around to avoid adverse repercussions from the reduction in force, and decided on the number and types of employees who should be eliminated"). But, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481–82; *see also Hunter v. Town of*

---

[6] The absence of any such evidence of approval also disposes of Thompson's assertion that the District "ratified" King's unlawful action. *See* Pl.'s Br. 15. To sustain a ratification theory of municipal liability, a plaintiff must identify evidence that the "authorized policymakers" knew of and affirmatively approved both the acting official's "decision and the basis for it." *Praprotnik*, 485 U.S. at 127; *see, e.g.*, *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (no ratification where "no evidence that the City manager made a deliberate choice to endorse the Fire Chief's decision and the basis for it"). The "mere refusal to overrule a subordinate's completed act does not constitute approval." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999); *see also Gillette*, 979 F.2d at 1348 (policymaker must "approve a subordinate's decision and the basis for it before the policymaker will be deemed to have ratified the subordinate's discretionary decision" (emphasis omitted)); *Milam v. City of San Antonio*, 113 Fed. Appx. 622, 626–27 (5th Cir. 2004) (neither going along with nor failing to investigate a subordinate's decision "vest[s] final policymaking authority in the subordinate"). As plaintiff has not identified any record evidence that the District affirmatively approved King's action and the basis for it, he has not shown that there is a material factual dispute regarding ratification. *See Gillette*, 979 F.2d at 1348. *Cf. Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994); *Melton v. City of Okla. City*, 879 F.2d 706, 725 (10th Cir. 1989) (ratification where evidence showed police chief who fired plaintiff had met with final policymaker who "expressly approved such dismissal").

*Mocksville, North Carolina*, 897 F.3d 538, 561 (4th Cir. 2018) (police chief's "*discretion*

to hire and fire employees" did not show that he had "responsibility for establishing related

policy" regarding personnel decisions (internal quotation marks omitted)).  If it did, "the

result would be . . . *respondeat superior* liability,' which *Monell* had rejected."  *Triplett*,

108 F.3d at 1453 (quoting *Praprotnik*, 485 U.S. at 126); *see also Littlejohn v. City of New

York*, 795 F.3d 297, 315 (2d Cir. 2015) (official "was not a final municipal policymaker

such that her isolated personnel decision to demote [plaintiff] could be said to represent

official City policy"); *Gillette v. Delmore*, 979 F.2d 1342, 1350 (9th Cir. 1992) (fire chief's

discretionary authority to hire and fire employees did not make him responsible for

establishing city employment policy).

 That King lacked relevant final policymaking authority is confirmed by the Lottery

Board's general supervision and oversight authority regarding King's employment

decisions.  District law provided that King's power to "[e]mploy other assistants and

employees," in addition to being constrained by the CMPA, was "subject to the direction

and supervision of the Board."  D.C. Code § 2-2503 (1981); *see also* D.C. Code § 3-

1303(d)(3) (2001) (same).  That oversight cuts strongly against the notion that King was

empowered to make final District employment policy of the type at issue here.  In

*Praprotnik*, for example, the Supreme Court rejected *Monell* liability where the City of St.

Louis maintained a supervisory commission "empowered . . . to review and correct

improper personnel actions."  485 U.S. at 128.  Similarly, in *Triplett*, our Circuit Court

rejected *Monell* liability against the District because the prison officials responsible for the

challenged conduct were subject to "the general direction and supervision" of the Director

of the District's Department of Corrections, and the Department maintained "the authority to promulgate rules and regulations for" the prisons, "subject to approval by the District's Council." 108 F.3d at 1453; *see also Hunter*, 897 F.3d at 561 (police chief lacked final policymaking authority regarding personnel decisions where such decisions were "always subject to review by" the town manager); *Delia v. Benton Cty.*, No. 05-6123, 2007 WL 894829, at *3 (D. Or. Mar. 21, 2007) (rejecting *Monell* claim where county official "had administrative decisionmaking authority with respect to the decision not to hire plaintiff" but official "exercise[d] this power under constraints imposed by" county authorities).

Thompson counters that the absence of record evidence that the Lottery Board in fact exercised its authority to direct and supervise King's decisionmaking renders the aforementioned written policy immaterial. Pl.'s Br. 12–14. Not so. In *Praprotnik*, a plurality of the Supreme Court rejected Justice Brennan's concurring view that courts "must determine where [the relevant] policymaking authority *actually* resides." 485 U.S. at 143 (Brennan, J., concurring) (emphasis added). The *Praprotnik* plurality held that "ad hoc searches for officials possessing such '*de facto*' authority would serve primarily to foster needless unpredictability in the application of § 1983" and would move the law of municipal liability closer to *respondeat superior*. *Id.* at 131. In that case, a municipal architect was transferred between city agencies before being laid off. *Id.* at 115–16. The architect's superiors at both agencies had discretion to appoint and transfer employees, but the city's civil service board retained the authority to review any such decisions, along with the power to interpret and enforce the relevant municipal law requiring certain personnel decisions to be based on merit and fitness. *Id.* In the architect's case, the civil service

board declined to review either the transfer or the layoff. *Id.* The Eighth Circuit, relying on, *inter alia*, the civil service board's lack of *de facto* review, held that the architect's superiors were final policymakers under *Monell*. *Id.* at 129. A plurality of the Supreme Court disagreed, holding that the board's failure to exercise its review power was insufficient to conclude that the agency superiors had final policymaking authority regarding personnel transfers and layoffs. *Id.* "Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them." *Id.* at 130.

As such, the fact that King exercised his discretion over personnel decisions "subject to review by the municipality's authorized policymakers," while not dispositive, indicates that he was *not* a final policymaker, even if that review authority was not, in fact, exercised. *Id.* at 127; *see also Kujawski v. Bd. of Comm'rs of Bartholomew Cty., Ind.*, 183 F.3d 734, 739 (7th Cir. 1999) (it is a "well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority," as "[t]here must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire"); *Polite v. Town of Clarkstown*, 120 F.Supp.2d 381, 385 (S.D.N.Y. 2000) (applying *Praprotnik* and rejecting *Monell* liability where applicable law provided that officials were "subject to the general authority and direction of the town board and to such orders and regulations as the town board may prescribe, not inconsistent with the law" (internal quotation marks omitted)). There is no record evidence that the Board so abdicated its supervisory powers as to establish a "custom or usage" of non-

supervision "having the force of law." *See Praprotnik*, 485 U.S. at 124 n.1. Although King testified that no one supervised his personnel decisions, *Thompson III*, 832 F.3d at 349, that fact "is equally consistent with a presumption" by the Lottery Board and the District that King would "faithfully attempt[] to comply with the policies" in place—i.e., the CMPA, *see Praprotnik*, 485 U.S. at 130. The Lottery Board's "mere failure to investigate" or supervise King's exercise of his discretionary decisionmaking authority over personnel issues "does not amount to a delegation of policymaking authority." *Praprotnik*, 485 U.S. at 130 (failure to supervise does not vest policymaking authority in subordinate "especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale").

For these reasons, Thompson has not identified specific facts establishing a genuine triable issue concerning his final policymaker theory of District liability.

**B. Custom or Practice**

Plaintiff's second theory of District liability is that King acted pursuant to a "custom" that, while not "formally approved by an appropriate decisionmaker," subjects the District "to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404; *see* Pl.'s Br. 19–20. There are several problems with this contention. First, Thompson's conception of custom liability is squarely at odds with the Circuit Court's articulation of the constitutional violation in this case: the failure to afford Thompson notice and a hearing before transferring him to a position slated for elimination. *See Thompson III*, 832 F.3d at 345. Not only that, Thompson expressly "agrees that he cannot demonstrate that he suffered injury because of a District custom,

policy, or practice of not providing constitutionally-required notice to employees entitled to such notice." Pl.'s Br. 19. This concession alone is sufficient to dispose of his custom liability claim.[7]

Nevertheless, Thompson argues that he "was fired pursuant to a municipal custom of retaliating." *Id.* (internal quotation marks omitted). Even if a retaliation theory were viable, however, Thompson would still have to "prove the existence of a *widespread* practice that, although not authorized by written law or express municipal policy, is *so permanent and well settled* as to constitute a custom or usage with the force of law." *Praprotnik*, 485 U.S. at 127 (emphases added) (internal quotation marks omitted); *see also Jett*, 491 U.S. at 737 (municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's "acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity" (internal quotation marks omitted)); *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992) (municipality may be held liable where the unconstitutional conduct of subordinate employees is "so manifest as to imply the constructive acquiescence of senior policy-making officials").

Here, Thompson points only to allegations made against the Lottery Board in *Fox v. District of Columbia*, 990 F.Supp. 13, 15 (D.D.C. 1997). *See* Pl.'s Br. 19 n.10. Put simply, that is not enough to "allow a reasonable jury to return a verdict in [plaintiff's]

---

[7] Arguably, the scope of Thompson's concession resolves the entire *Monell* issue in the District's favor. But, given this case's history, I will treat the statement as ill-considered lawyerly rhetoric rather than a voluntary waiver of plaintiff's *Monell* claim.

favor . . . on this precise question." *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation marks and alterations omitted). As an initial matter, the District correctly points out that the allegations in *Fox* involved events that occurred when King was not even employed by the District. *See* Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. 9 [Dkt. # 198] (citing *Fox v. District of Columbia*, 83 F.3d 1491, 1493 (D.C. Cir. 1996)). But even if *Fox* were germane factually, Thompson's custom claim still could not survive summary judgment. Take *Tabb v. District of Columbia*, 605 F.Supp.2d 89 (D.D.C. 2009) as an example. There, this Court rejected the theory "that the District of Columbia had a policy or practice of retaliating against employees for exercising the right to free speech under the First Amendment" because an isolated "incident of alleged retaliation against plaintiff does not qualify as pervasive." *Id.* at 96 (citing *Carter v. District of Columbia*, 795 F.2d 116, 123–24 (D.C. Cir. 1986)); *see also Mejia v. City of New York*, 228 F.Supp.2d 234, 253–54 (E.D.N.Y. 2002) (no custom or practice where challenged action "was the first and only" of its kind). Such is the case here. Thompson has not identified specific facts showing a genuine triable issue as to whether the District had a widespread and pervasive custom or practice of denying procedural due process, and this theory of *Monell* liability cannot survive summary judgment.[8]

---

[8] The record also demonstrates that there is no genuine dispute that Thompson's *Monell* claim fails for lack of causation. *See Brown*, 520 U.S. at 404 (plaintiff in § 1983 action must not only "identify conduct properly attributable to the municipality" but also demonstrate "a direct causal link between the municipal action and the deprivation of federal rights"); *Reimer v. Smith*, 663 F.2d 1316, 1322 n. 4 (5th Cir. 1981) ("plaintiff cannot succeed in a [§] 1983 action" without "demonstrat[ing] a causal connection between the state official's alleged wrongful action and his deprivation of life, liberty, or property"). "In procedural due process claims, the deprivation by state action of a

In the end, Thompson seeks to hold the District vicariously liable for the isolated conduct of its non-policymaking employee, King. Unfortunately for Thompson, the law does not allow for municipal liability under § 1983 in such a case.

## CONCLUSION

Thus, for all of the foregoing reasons, the District's motion for summary judgment is GRANTED. An order consistent with this Memorandum Opinion is separately and contemporaneously issued herewith.

RICHARD J. LEON
United States District Judge

---

constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original). As such, Thompson's rights in this case were violated not when he was deprived of his property interest but when he failed to receive notice and an opportunity to challenge that deprivation. *See, e.g.*, *Oden, LLC v. City of Rome, Ga.*, 707 Fed. Appx. 584, 588 (11th Cir. 2017) ("relevant act for assessing municipal liability" for procedural due process claim is not deprivation but "lack of notice"). The parties agree that King, as Lottery Director, "was not responsible for providing Plaintiff pre-transfer notice and an opportunity to be heard, as this task was handled by the agency's Human Resources Division or by other individuals in the agency." SUMF ¶ 4; *see also* Dep. of Frederick King 4 [Dkt. # 195-3]; Decl. of Frederick King 2 [Dkt. # 195-4]. As King was not responsible for providing process, King could not have caused Thompson's constitutional injury, and nothing in the record suggests that the agency employees actually responsible for providing process could create *Monell* liability for the District.